

**MERIDIAN**
WORKING CAPITAL

# *PURCHASE ORDER FINANCING LOAN AND SECURITY AGREEMENT*

## AGREEMENT #

This **PURCHASE ORDER FINANCING LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of _____ between _____, ("Dealer") and **Meridian Working Capital LLC** ("Lender").

## RECITALS

A   Dealer has requested that Lender provide financing to Dealer to enable Dealer to acquire inventory from its suppliers.

B   Dealer has requested that Guarantor(s) guaranty the Obligations.

C   This Agreement is entered into and will be performed in the Controlling State.

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the parties hereby agree as follows:

## AGREEMENT

1.   **Certain Definitions and Index to Definitions**. All terms contained in this Agreement which are not specifically defined herein shall have the meanings provided in the UCC to the extent the same are used herein. All references herein to the singular or plural shall also mean the plural or the singular, respectively. As used herein, the following terms shall have the following meanings:

   1.1   "**Advance Request**" – A request for an Advance by the submission of a Request Package.

   1.2   "**Advances**" - An extension of credit hereunder for the sole purpose of acquiring Subject Goods from a Supplier.

   1.3   "**Application Fee**" - $250.00

   1.4   "**Buyer**" – A customer of Dealer who has agreed to purchase the Subject Goods.

   1.5   "**Collateral**" - All Dealer's now owned and hereafter acquired personal property and fixtures, and proceeds thereof (including proceeds of proceeds), including without limitation: Accounts, Chattel Paper; Inventory; Equipment; Instruments, Investment Property; Documents; and General Intangibles.

   1.6   "**Controlling State**" – Arizona.

   1.7   "**Customer Purchase Order**" – A binding Purchase Order from a Buyer requesting the sale by Dealer to the Buyer of Subject Goods.

   1.8   "**Dealer**" - See Preamble hereof.

   1.9   "**Default Rate**" – 200% of the Interest Rate.

   1.10   "**Event of Default**" - See Section 13 hereof.

   1.11   "**Interest Rate**" - .225% per day.



1.12 **"Lender Credits"** – Obligations owing by a Supplier to Lender.

1.13 **"Loan Balance"** The unpaid balance of Advances, interest, and other payments made by Lender to or for the account of Dealer which Dealer is obligated to repay Lender hereunder.

1.14 **"Loan Documents"** - This Agreement, together with any documents, instruments and agreements, executed and/or delivered in connection herewith, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced. .

1.15 **"Monthly Administrative Fee"** - $35.00.

1.16 **"Obligations"** - All present and future obligations owing by Dealer to Lender whether or not for the payment of money, whether direct or indirect, absolute or contingent, joint or several, primary or secondary, liquidated or unliquidated, whether arising before, during or after the commencement of any Bankruptcy Case in which Dealer is a Dealer.

1.17 **"Receipt Date"** – The latest date, as set forth in a Request Package, by which the Dealer may receive Subject Goods.

1.18 **"Request Package"** – A request to Lender for an Advance in the form of Exhibit A.

1.19 **"Sold"** – Goods are sold hereunder when they have been sold in the ordinary course of Dealer's business, returned to the corresponding Supplier, lost, damaged, destroyed, stolen, or are otherwise out of the Dealer's possession other than for the purpose of repair or alteration.

1.20 **"Subject Goods"** –Goods described in a Request Package.

1.21 **"Supplier"** – A domestic supplier of the Subject Goods.

1.22 **"Supplier Invoice"** – An invoice from a Supplier to the Dealer representing the sale of Subject Goods.

1.23 **"Supplier Letter"** - a letter agreement between Lender and Dealer and acknowledged by Dealer in the form attached hereto as Exhibit B.

1.24 **"Termination Date"** - The earlier of (i) one year from the date hereof, or (ii) the date on which Lender elects to terminate this Agreement pursuant to the terms herein.

1.25 **"UCC"** - The Uniform Commercial Code as may now or in the future be in effect.

2. **Advances**.

    2.1 Advance Requests.

        2.1.1 Advances.

            2.1.1.1 Lender may in its sole discretion make Advances to or for the account of the Dealer upon Lender's receipt of a Request Package.

            2.1.1.2 Advances may be disbursed directly to the Supplier listed in the Request Package or to the Dealer, in Lender's sole discretion.

Case 11-11045    Doc# 11    Page 2    Filed 04/16/11    Page 2 of 11    Intl_____

BN 5652879v1



2.1.1.3 The amount of any Advance will not exceed the cost to the Dealer of the Subject Goods.

2.2 Repayment of Advances.

2.2.1 When the Subject Goods are shipped to the Buyer, Dealer shall included a legend on the invoice, providing that the Account has been assigned to and is payable only to Lender, and will provide a copy thereof to Lender.

2.2.2 Upon Lender's receipt of a payment from a Buyer, Lender will apply the payment to the corresponding Advance and to any corresponding accrued interest and fees, and remit the balance, if any, to Dealer. After an Event of Default, Lender may apply payments to any Advance, irrespective of any contrary instructions that Lender receives.

2.3 ACH Authorization.

2.3.1 Lender may initiate electronic debit or credit entries through the ACH (or other electronic payment) system to any deposit account maintained by Dealer to effect repayment of any Obligation.

3. **Lender Credits**.

3.1 Lender may offset Lender Credits against amounts disbursed to a Supplier from whom the Lender Credit is owed.

3.2 Dealer shall not have any right to any Lender Credits and any offset against the amount disbursed a Supplier will not reduce or otherwise affect the Dealer's Obligations hereunder.

4. **No Claim Against Lender**.

4.1 Dealer shall not assert against Lender any claim or defense Dealer may have against any Supplier.

5. **Interest and Fees**.

5.1 Interest.

5.1.1 Basic Interest. Interest on the Loan Balance shall accrue at the Interest Rate and is payable out of the first payments received by Lender on account of the Loan Balance.

5.1.2 Default Interest.

5.1.2.1 Immediately upon the occurrence of an Event of Default, interest shall accrue at the Default Rate on all Obligations.

5.1.2.2 Interest shall accrue at the Default Rate on any Advance or other charge to the Loan Balance that is outstanding for longer than 90 days.

5.1.2.3 Lender's failure to assess interest at the Default Rate shall not be deemed a waiver by Lender to charge such Default Rate. Lender reserves the right, and Dealer hereby acknowledges that Lender may, recalculate interest at the Default Rate.

5.1.3 Calculation. Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed.



5.2    Fees.

   5.2.1    Application Fee. Dealer shall pay the Application Loan Fee to Lender immediately upon the submission to Lender of **each** Request Package.

   5.2.2    Monthly Administrative Fee. – Dealer shall pay the Monthly Administrative Fee on the first day of each month.

   5.2.3    Additional Fees. Dealer shall pay to Lender fees for such services as Lender customarily charges, as set forth in Lender's Standard Fee Schedule, a copy of which will be provided to Dealer on demand. Lender shall have the right to change all or any of such fees upon ten (10) days notice to Dealer.

6.    **Grant of Security Interest**. To secure the payment and performance in full of all of the Obligations, Dealer grants to Lender a continuing security interest in the Collateral and all proceeds and products thereof.

7.    **Authority**.

   7.1    Dealer irrevocably authorizes Lender and any designee of Lender, at Dealer's expense, to exercise at any times in Lender's or such designee's discretion any of the following powers until the Obligations have been paid in full:

   7.1.1    Receive, take, endorse, assign, deliver, accept, and deposit, in the name of Lender or Dealer, any and all cash, checks, commercial paper, drafts, remittances, and other instruments and documents relating to the Collateral or the proceeds thereof;

   7.1.2    Take or bring, in the name of Lender or Dealer, all steps, actions, suits or proceedings deemed by Lender necessary or desirable to effect collection of or other realization upon the Collateral;

   7.1.3    Pay any sums necessary to discharge any lien or encumbrance which is senior to Lender's security interest in the Collateral, which sums shall be included as Obligations hereunder.

   7.1.4    After an Event of Default:

      7.1.4.1    Change the address for delivery of mail to Dealer and to receive and open mail addressed to Dealer;

      7.1.4.2    Extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor, without affecting any of the Obligations;

8.    **Covenants and Rights Concerning the Collateral.**

   8.1    **Inspection**. The Lender may inspect any Collateral at any time upon reasonable notice.

   8.2    **Personal Property**. The Collateral shall remain personal property at all times. Dealer shall not affix any of the Collateral to any real property in any manner that would change its nature from that of personal property to a fixture.

   8.3    **Lender's Collection Rights**. Lender shall have the right at any time notify any Account Debtors and any obligors under instruments to make payments directly to Lender.



9. **Limitations on Obligations Concerning Maintenance of Collateral.**

   9.1 **No Disposition of Collateral.** Except as to inventory held for sale or lease in ordinary course of business, Dealer has no right to sell, lease, or otherwise dispose of any of the Collateral.

   9.2 **Purchase Money Security Interests.** To the extent Dealer uses any advance from Lender to purchase Inventory, Dealer's repayment of the Obligations shall apply on a "first-in-first-out" basis so that the portion of such advance used to purchase a particular item of Inventory shall be paid in the chronological order the Dealer purchased the inventory.

10. **Representations and Warranties.** Dealer represents and warrants to Lender as follows:

    10.1 **Priority Interest.** Dealer has good and indefeasible title to the Collateral, free and clear of all adverse claims, liens, security interests, and restrictions on transfer or pledge, except as created by this Agreement.

    10.2 **Location of Collateral.** The Inventory and Equipment are not stored with a bailee, warehouseman, or similar party (and will not be stored without Lender's prior written consent) and are located only at the locations identified on Exhibit C hereto.

    10.3 **Accurate Records.** Dealer now keeps, and hereafter at all times shall keep, correct and accurate records itemizing and describing the kind, type, quality, and quantity of the Inventory, and Dealer's cost therefore.

11. **Affirmative Covenants.** Until full payment of the Obligations and termination of this Agreement, Dealer shall:

    11.1 **Financial Statements, Reports and Certifications.** Furnish to Lender, in form and substance satisfactory to Lender:

       11.1.1 **Annual Financial Statements.** As soon as possible after the end of each fiscal year of Dealer, and in any event within 90 days thereafter a complete copy of Dealer's financial statements, including but not limited to (a) the management letter, if any, (b) the balance sheet as of the close of the fiscal year, and (c) the income statement for such year, together with a statement of cash flows, prepared by a firm of independent certified public accountants of recognized standing and acceptable to Lender, or if permitted by Lender in writing, by Dealer; and

       11.1.2 **Other Financial Statements.** No later than 15 days after the close of each month Dealer's balance sheet as of the close of such Accounting Period and its income statement for that portion of the then current fiscal year through the end of such period certified by Dealer's chief financial officer as being complete, correct, and fairly representing its financial condition and results of operations.

       11.1.3 **Tax Returns.** Copies of each of Dealer's:

          11.1.3.1 federal income tax returns, and any amendments thereto, within 10 days of the filing thereof with the Internal Revenue Service; and

          11.1.3.2 Federal payroll tax returns within 10 days of filing, together with proof, satisfactory to Lender, that all taxes have been paid.

    11.2 **Inspections.**

       11.2.1 Permit Lender, during usual business hours, without notice to Dealer, to periodically have access to all premises where Collateral is located for the purposes of inspecting (and removing, if after the

Case 11-11045    Doc# 11    Filed 04/16/11    Page 5 of 11

BN 5652879v1



occurrence of an Event of Default) any of the Collateral, including Dealer's books and records; and to inspect, audit, make copies of, and make extracts from Dealer's Books as Lender may request.

        11.2.2   Without expense to Lender, Lender may use any of Dealer's personnel, equipment, including computer equipment, programs, printed output and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as lender, in its sole discretion, deems appropriate.

    11.3   **Expenses.** Pay all reasonable out-of-pocket expenses of Lender (including, but not limited to, fees and disbursements of Lender's counsel) incident to (whether by judicial proceedings or otherwise, and whether any resulting dispute resolution procedure involving tort, contract or other claims) the preparation, negotiation, execution, administration and enforcement of the Loan Documents, any amendments, extensions and renewals thereof, and any other documents prepared in connection with any transactions between Dealer and Lender, whether or not executed or in any way arising out of a bankruptcy proceeding commenced by or against Dealer, including but not limited to expenses incurred in enforcing or defending Lender's claims against Dealer or the Collateral, defending any avoidance actions, and expenses related to the administration of said proceeding.

    11.4   **Enforcement of Judgments.** Reimburse Lender for all costs and expenses, including attorneys' fees, which Lender incurs in enforcing any judgment rendered in connection with this Agreement. This provision is severable from all other provisions hereof and shall survive, and not be deemed merged into, such judgment.

    11.5   **Taxes and Expenses Regarding Dealer's Assets.** Make timely payment or deposit of all taxes, assessments or contributions required of Dealer.

    11.6   **Change in Name.** Give Lender written notice immediately upon forming an intention to change its name or form of business organization.

    11.7   **Insurance.** At all times maintain, with financially sound and reputable insurers, casualty insurance with respect to the Collateral and other assets. All such insurance policies shall be in such form, substance, amounts and coverage as may be satisfactory to Lender and shall provide for 30 days prior written notice to Lender of cancellation or reduction of coverage. Dealer hereby irrevocably authorizes Lender and any designee of Lender to obtain such insurance at Dealer's expense, and, after an Event of Default, to adjust or settle any claim or other matter under or arising pursuant to such insurance or to amend or cancel such insurance. Dealer shall deliver to Lender evidence of such insurance and a Lender's loss payable endorsement naming Lender as loss payee as to all existing and future insurance policies relating to the Collateral. Dealer shall deliver to Lender, in kind, all instruments representing proceeds of insurance received by Dealer. Lender may apply any and all insurance proceeds received at any time to the cost of repairs to or replacement of any portion of the Collateral or, at Lender's option, to the payment of or as security for any of the Obligations, whether or not due, in any order or manner as Lender determines.

12.   **Negative Covenants.** Until full payment of the Obligations and termination of this Agreement, Dealer will not:

    12.1   **Liens and Encumbrances.** Pledge, mortgage, or create or suffer to exist a security interest in the Collateral in favor of any person other than Lender.

    12.2   **Transfer of Assets.** Enter into any transaction not in the ordinary and usual course of Dealer's business, including the sale, lease, or other disposition of, moving, relocation, or transfer, whether by sale or otherwise, of any of Dealer's properties, assets (other than sales of Inventory to buyers in the ordinary course of Dealer's business as currently conducted).

    12.3   **Change of Name.** Change Dealer's name, Federal Employer Identification Number, business structure, or identity, or add any new fictitious name.



12.4 **Suspension of Business.** Suspend or go out of a substantial portion of its business.

12.5 **Chief Executive Office.** Relocate its chief executive office.

13. **Events of Default.** Each of the following events or conditions shall constitute an "Event of Default":

13.1 Dealer defaults in the payment of any Obligations or in the performance of any other provision hereof or of any other agreement now or hereafter in existence between Dealer and Lender;

13.2 If a Buyer disputes any Account which arose out of the funding of an Advance Request;

13.3 The incorrectness of, or Dealer's failure to comply with any of the provisions of, any representation or warranty contained in this Agreement;

13.4 Any transfer or disposition of any of the Collateral in violation of this Agreement;

13.5 Attachment, execution, or levy on any of the Collateral;

13.6 An order for relief is entered against any Obligor by any United States Bankruptcy Court; or any Obligor does not generally pay its debts as they become due (within the meaning of 11 U.S.C. 303(h) as at any time amended, or any successor statute thereto); or any Obligor makes an assignment for the benefit of creditors; or any Obligor applies for or consents to the appointment of a custodian, receiver, trustee, or similar officer for it or for all or any substantial part of its assets, or such custodian, receiver, trustee, or similar officer is appointed without the application or consent of any Obligor; or any Obligor institutes (by petition, application, answer, consent, or otherwise) any bankruptcy, insolvency, reorganization, moratorium, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding relating to it under the laws of any jurisdiction; or any such proceeding shall be instituted (by petition, application, or otherwise) against any Obligor; or any judgment, writ, warrant of attachment, execution, or similar process shall be issued or levied against a substantial portion of the property of any Obligor; or

14. **Default Costs.** Should an Event of Default occur, Dealer will pay to Lender all costs reasonably incurred by Lender for the purpose of enforcing its rights hereunder, including, but not limited to:

14.1 Costs of foreclosure;

14.2 Costs of obtaining money damages; and

14.3 A reasonable fee for the services of attorneys employed by Lender for any purpose related to this Agreement or the Obligations, including consultation, drafting documents, sending notices or instituting, prosecuting, or defending litigation or arbitration. It shall be presumed (subject to rebuttal only by the introduction of competent evidence to the contrary) that the amount recoverable is the amount billed to Lender by its counsel and that such amount will be reasonable if based on counsel customary billing rates charged to Lender by its counsel in similar matters. For the purposes of Section 1717 of the California Civil Code, Lender shall be the "prevailing party" if it recovers any funds whatsoever from an Obligor, whether by settlement, judgment or otherwise.

15. **Remedies.**

15.1 Upon the occurrence of any Event of Default at Lender's option:

15.1.1 Lender may:

15.1.1.1 Declare all Obligations to be immediately due and payable, without presentment, demand, protest, or notice of any kind, all of which are hereby expressly waived by Dealer. TO THE

BN 5652879v1

Case 11-11045    Doc# 11    Filed 04/16/11    Page 7 of 11

Page 7 of 11

Intl_____



EXTENT PERMITTED BY APPLICABLE LAW, DEALER HEREBY WAIVES ANY AND ALL NOTICES OR ANY REQUIREMENT THAT LENDER INFORM DEALER BY AFFIRMATIVE ACT OR OTHERWISE OF THE ACCELERATION OF DEALER'S OBLIGATIONS HEREUNDER;

15.1.1.2 Pursue any remedy available at law (including those available under the provisions of the UCC) or in equity to collect, enforce, or satisfy any Obligations then owing, whether by acceleration or otherwise.

15.1.2 Lender shall have the right to pursue any of the following remedies separately, successively, or concurrently:

15.1.2.1 File suit and obtain judgment and, in conjunction with any such action, seek any ancillary remedies provided by law, including levy of attachment and garnishment.

15.1.2.2 Take possession of any Collateral if not already in its possession without demand and without legal process. Upon Lender's demand, Dealer will assemble and make the Collateral available to Lender as they direct. Dealer grants to Lender the right, for this purpose, to enter into or on any premises where Collateral may be located.

15.1.2.3 Without taking possession, sell, lease, or otherwise dispose of the Collateral at public or private sale in accordance with the UCC.

15.2 DEALER WAIVES ANY REQUIREMENT THAT LENDER INFORM DEALER BY AFFIRMATIVE ACT OR OTHERWISE OF ANY ACCELERATION OF DEALER'S OBLIGATIONS HEREUNDER. FURTHER, LENDER'S FAILURE TO CHARGE OR ACCRUE INTEREST OR FEES AT ANY "DEFAULT" OR "PAST DUE" RATE SHALL NOT BE DEEMED A WAIVER BY LENDER OF ITS CLAIM THERETO.

16. **Foreclosure**.

16.1 **No Waiver**. No delay or failure by Lender to exercise any right or remedy accruing upon any Event of Default shall (a) impair any right or remedy, (b) waive any default or operate as an acquiescence to the Event of Default, or (c) affect any subsequent default of the same or of a different nature.

16.2 **Warranties**. Lender may sell the Collateral without giving any warranties as to the Collateral. This procedure will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

16.3 **Sales on Credit**. If Lender sells any of the Collateral upon credit or for future delivery, Dealer will be credited only with payments actually made by the purchaser, received by Lender and applied to the indebtedness of the Purchaser. In the event the purchaser fails to pay for the Collateral, Lender may resell the Collateral and Debtor shall be credited with the proceeds of the sale.

16.4 **Waivers by Debtor**. If Lender seeks to take possession of any or all of the Collateral by judicial process, Dealer hereby irrevocably waives:

16.4.1 Any bond and any surety or security relating thereto by any statute, court rule, or otherwise as an incident to such possession;

16.4.2 Any demand for possession prior to the commencement of any suit or action to recover possession thereof; and

BN 5652879v1



**MERIDIAN**
WORKING CAPITAL

  16.4.3 Any requirement that Lender retains possession of and not disposes of any such Collateral until after trial or final judgment.

  16.5 **Commercially Reasonable Disposition of Collateral.** If, after Lender disposes of any Collateral after an Event of Default, Lender elects, in its sole discretion, to obtain the written opinion of three (3) commercial loan officers with at least three (3) years of commercial loan workout experience each, that the manner of the disposition was not inconsistent with how each loan officer would have handled the disposition, such disposition shall be conclusively deemed commercially reasonable, notwithstanding that other commercial loan workout officers may disagree with such opinion.

  16.6 **No Lien Termination without Release.** In recognition of the Lender's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Dealer, Lender shall not be required to terminate any UCC Financing Statements filed in its favor against the Dealer relating to the Collateral unless and until Dealer and all entities which are secondarily liable on the Obligations has executed and delivered to Lender a general release, in the form of Exhibit B hereto. **Dealer understands that this provision constitutes a waiver of its rights under §9-513 of the UCC.**

  16.7 **Liquidation Success Premium.** If Dealer shall essentially cease operating as a going concern, and the proceeds of Collateral.

17. **Termination**.

  17.1 This Agreement shall become effective upon the execution and delivery hereof by Dealer and Lender and shall continue in full force and effect for one year from the date hereof.

  17.2 Upon the Termination Date, the unpaid balance of the Obligations shall be due and payable without demand or notice.

18. **Revocation of Dealer's Right to Sell Inventory Free and Clear of Lender's Security Interest.** Lender may, upon the occurrence of an Event of Default, revoke Dealer's right to sell Inventory free and clear of Lender's security interest therein.

19. **Account Stated.** Lender shall render to Dealer a statement setting forth the transactions arising hereunder. Each statement shall be considered correct and binding upon Dealer, absent manifest error, as an account stated, except to the extent that Lender receives, within 30 days after the mailing of such statement, written notice from Dealer of any specific exceptions by Dealer to that statement.

20. **Entire Agreement.** This agreement supersedes all other agreements and understandings between the parties hereto, verbal or written, express or implied, relating to the subject matter hereof. No promises of any kind have been made by Purchaser or any third party to induce Seller to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

21. **Miscellaneous**.

  21.1 Notices.

   21.1.1 All notices required to be given to either party hereunder shall be deemed given upon the first to occur of: (a) deposit thereof in a receptacle under the control of the United States Postal Service; (b) transmittal by electronic means to a receiver under the control of the party to whom notice is being given; or (c) actual receipt by the party to whom notice is being given, or an employee or agent of thereof. For purposes hereof,



the addresses of the parties are as set forth below or as may otherwise be specified from time to time in a writing sent by one party to the other in accordance with the provisions hereof:

**Dealer:**

Address: _____

Attention: _____
Fax Number: _____

**Lender:**

Address:     11811 N. Tatum Blvd Suite 3031
             Phoenix, AZ 85028
Attention:   Contract Management
Fax Number:  (619) 482-4882

    21.2    **Survival.** All representations, warranties and agreements herein contained shall be effective so long as any portion of this Agreement remains executory.

    21.3    **Amendment and Waiver.** Neither this Agreement nor any provisions hereof may be changed, waived, discharged or terminated, nor may any consent to the departure from the terms hereof be given, orally (even if supported by new consideration), but only by an instrument in writing signed by all parties to this Agreement. Any waiver or consent so given shall be effective only in the specific instance and for the specific purpose for which given.

    21.4    **No Waiver.** No failure to exercise and no delay in exercising any right, power, or remedy hereunder shall impair any right, power, or remedy which Lender may have, nor shall any such delay be construed to be a waiver of any of such rights, powers, or remedies, or any acquiescence in any breach or default hereunder; nor shall any waiver by Lender of any breach or default by Dealer hereunder be deemed a waiver of any default or breach subsequently occurring. All rights and remedies granted to Lender hereunder shall remain in full force and effect notwithstanding any single or partial exercise of, or any discontinuance of action begun to enforce, any such right or remedy. The rights and remedies specified herein are cumulative and not exclusive of each other or of any rights or remedies that Lender would otherwise have. Any waiver, permit, consent or approval by Lender of any breach or default hereunder must be in writing and shall be effective only to the extent set forth in such writing and only as to that specific instance.

    21.5    **Choice of Law.** This agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Controlling State.

    21.6    **Venue.** The parties agree that any suit, action or proceeding arising out of the subject matter hereof, or the interpretation, performance or breach of this Agreement, shall, if Lender so elects, be instituted in the United States District Court for the District of the Controlling State in which the Lender's chief executive office is located or any court of said state (the "Acceptable Forums"), each party agrees that the Acceptable Forums are convenient to it, and each party irrevocably submits to the jurisdiction of the Acceptable Forums, irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and waives any and all objections to jurisdiction or venue that it may have under the laws of the Controlling State or otherwise in those courts in any such suit, action or proceeding. Should such proceeding be initiated in any other forum, Dealer waives any right to oppose any motion or application made by Lender as a consequence of such proceeding having been commenced in a forum other than an Acceptable Forum.

BN 5652879v1



21.7 **Counterparts**. This agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**DEALER:**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**LENDER:** **MERIDIAN WORKING CAPITAL LLC**

By: _____
Name: Tim Irish
Title: CEO